UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID JOHN MORANIEC,

                 Plaintiff,           Civil Action No. 12-13495
                                           Honorable Bernard A. Friedman
                                           Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 17]

Plaintiff David John Moraniec ("Moraniec") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [14, 17], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Moraniec is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Moraniec's Motion for Summary Judgment [14] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On June 9, 2008, Moraniec filed applications for DIB and SSI, alleging a disability onset date of July 8, 2006. (Tr. 152-58). These applications were denied initially on August 28, 2008. (Tr. 77-85). Moraniec filed a timely request for an administrative hearing, which was held on July 8, 2010, before ALJ Richard Sasena. (Tr. 45-74). Moraniec, who was represented by attorney Jamil Akhtar, testified at the hearing, as did vocational expert ("VE") Diane Regan. (*Id.*). On December 10, 2010, the ALJ found that Moraniec was not disabled. (Tr. 25-39). On June 20, 2012, the Appeals Council denied review. (Tr. 1-5). Moraniec filed for judicial review of the final decision on August 8, 2012 [1].

### B.     Background

#### 1.     *Disability Reports*

In an undated disability report, Moraniec indicated that his ability to work is limited by post-traumatic stress disorder, mitral valve prolapse, panic attacks, and anxiety disorder. (Tr. 173). Moraniec reported that these conditions first interfered with his ability to work on July 8, 2006, and that he has not worked since that time. (*Id.*).

Moraniec completed high school but had no further education. (Tr. 179). Prior to stopping work, Moraniec worked as a police officer at the airport. (Tr. 174). In that job, he patrolled the roads and otherwise enforced the law. (*Id.*). He was required to walk four hours per day; sit six hours per day; and stand two hours per day. (*Id.*). He was frequently required to lift 25 pounds (and had to lift up to 200 pounds). (*Id.*).

Moraniec indicated that he had treated with several medical providers regarding his physical and mental ailments. (Tr. 175-77). At the time of the report, he was taking several medications and had had several tests performed (including blood tests, a stress test, and an

EKG).  (Tr. 178).

In a function report dated June 24, 2008, Moraniec reported that he lives in a house with a friend (an "elderly man").  (Tr. 197).  When asked to describe his daily activities, Moraniec indicated that he uses the bathroom often, watches television, feeds his dogs, sits outside, takes a nap in the afternoon, takes his medication, and talks on the telephone.  (*Id.*).  When asked to describe what he could do before the onset of his conditions that he can no longer do, Moraniec indicated: "function in the capacity of a law enforcement officer."  (Tr. 198).  His condition interferes with his sleep:  the medication he takes makes him tired, but he has difficulty sleeping and suffers from nightmares and heart palpitations.  (*Id.*).  He does not have any difficulties with personal care but does need reminders to take medication.  (Tr. 198-99).  Moraniec prepares his own meals (cereal, sandwiches, soup) on a daily basis.  (Tr. 199).  He is able to vacuum, do laundry, and mow the lawn.  (*Id.*).  He goes outside every day and is able to drive a car (although he said that he has "had periods when anxiety and panic attacks would not allow [him] to drive"). (Tr. 200).  He goes grocery shopping once a week, and he is able to handle money (though he noted he lacks income to pay bills).  (*Id.*).  His hobbies include reading and watching television; he is no longer able to attend car shows, which he previously enjoyed, because he is uncomfortable in crowds of people or public places.  (Tr. 201).  He spends time with friends and with his daughter.  (*Id.*).  He does not have any problems getting along with family, friends, or neighbors, although he tries to avoid people and social places.  (Tr. 202).

When asked to identify functions impacted by his condition, Moraniec checked talking and concentration.  (*Id.*).  However, he has no trouble following written instructions, and he finishes what he starts.  (*Id.*).  He has more difficulty following spoken instructions.  (*Id.*).  He gets along well with authority figures and has never been fired from a job because of problems

3

getting along with other people. (Tr. 203). He handles changes in routine without problem. (*Id.*). He indicated that he has several fears – including fear of public places, of dying, of terrorist attacks, of passing out, and of losing control of the car while driving. (*Id.*).

In a third party function report dated June 24, 2008, Moraniec's friend, Wesley Pontius, reported that Moraniec lived with him, and that the two spend four hours per day together watching television. (Tr. 181). Pontius indicated that Moraniec spends his time resting, helping with meals, and feeding and caring for his pets. (*Id.*). Pontius indicated that Moraniec has no trouble with personal care and does not need any reminders to take care of his personal needs or to take medication. (Tr. 181-82). He reported that Moraniec prepares his own meals on a daily basis, helps clean the house, and cuts the grass. (Tr. 183). Pontius indicated that Moraniec is able to drive, go grocery shopping, and handle money. (Tr. 184). According to Pontius, Moraniec does not have any trouble getting along with people; he talks with others on the telephone and visits his daughter. (Tr. 185-86). Pontius indicated that Moraniec has difficulty completing tasks and finishing what he starts, and he is "moody at times." (Tr. 186-87).

In an October 27, 2008 disability appeals report, Moraniec reported that his condition had changed since his last report. (Tr. 205). Specifically, he claimed that the severity and frequency of his anxiety attacks had increased, his depression had become more severe, and he had increased pain in his neck. (*Id.*). He indicated that, because of his depression and agoraphobia, he spends most of his time at home. (Tr. 211).

### 2. *Plaintiff's Testimony*

At the July 8, 2010 hearing before the ALJ, Moraniec testified that he graduated from high school and attended the police academy. (Tr. 54). He worked as a police officer at Detroit Metro Airport from March of 1993 until July of 2006. (Tr. 51, 189). Since that time, he has not

attempted to obtain employment, primarily because of his neck pain and anxiety.  (*Id.*).  He also suffers from gout, and when he experiences an "attack," he uses a cane.  (Tr. 52).  Moraniec testified that he received long term disability benefits for one year after he stopped working.  (Tr. 53).  He applied for worker's compensation benefits, but his claim was denied.  (*Id.*).

Moraniec testified that, on a typical day, he tries to "move around," but takes a nap in the afternoon (for a few hours) because he gets "pretty wiped out."  (Tr. 56-57).  He is able to read, watch television, and sit outside with his dogs in the backyard.  (Tr. 57).  He also likes to "tinker with things in the garage" and watch sports.  (Tr. 60).  He gets along well with his family, and he sees his teenage daughter once or twice a week (when he drives her to school).  (Tr. 61-62).  He can walk approximately one block, stand for 20-30 minutes, sit for one hour, and lift 20-25 pounds.  (Tr. 58).  He has difficulty sleeping at night because of neck pain, which ranges from a 4 or 5 to a 9 out of 10 on the pain scale.  (Tr. 63, 68).  He does not like to be around crowds, so he goes grocery shopping at night.  (Tr. 64, 66).

Moraniec takes several medications, including cortisone and allopurinol (for gout), indomethacin (an anti-inflammatory), Lexapro (for depression and panic disorder), Protonix (for acid reflux), and Ativan (to help him sleep).  (Tr. 54).  At the time of the hearing, he was not receiving any type of psychiatric counseling because he could not afford the co-pay.  (Tr. 55).  His family physician was refilling his Lexapro and Ativan prescriptions.  (Tr. 56).

    3.    *Medical Evidence*

    (a)    *Physical Impairments*

The ALJ found that Moraniec suffers from the severe physical impairments of history of tachyrhythmia, degenerative disc disease, and gout.[1]  (Tr. 27).  Medical evidence pertaining to

---

[1] The ALJ also found that Moraniec's joint pain, ulcers, acid reflux, hypertension, and "torn tendon" in his right foot do not constitute severe impairments under the Act.  (Tr. 31).  Moraniec

each of these conditions is discussed below.

Moraniec alleges that he is unable to work due, in part, to degenerative disc disease in his neck and low back.[2]  In early 2005, Moraniec complained to his primary care physician, Dr. Bruce Terrio, that he had been experiencing neck and low back pain for approximately two months.  (Tr. 595).  X-rays taken of Moraniec's cervical spine on January 12, 2005 showed spondylosis at C5-C6.  (Tr. 528).  Dr. Terrio referred Moraniec to Dr. Vijay Samuel, a neurologist, who saw Moraniec on January 25, 2005.  (Tr. 547-48).  Upon examination, Dr. Samuel found that Moraniec had a limited range of motion in the neck with lateral rotation and tenderness in the cervical paraspinal muscles.  (Tr. 547).  Dr. Samuel suspected "cervical spine degenerative disk problems" and advised Moraniec to "start some kind of regular aerobic exercise program and back and neck strengthening as well."  (Tr. 548).  An MRI conducted on February 23, 2005, confirmed disc protrusions at C5-C6 and C6-C7 with effacement of the subarachnoid space.  (Tr. 554).

The record also contains a letter from Dr. Terrio, dated July 2, 2010, indicating that he had been treating Moraniec for moderate to severe C6 radiculopathy and a disc protrusion at C5-C6 and C6-C7 with effacement of the subarachnoid.  (Tr. 641).  He also provided a medical source statement, dated June 29, 2010, in which he opined that Moraniec could frequently lift 10 pounds and occasionally lift 20 pounds; stand and/or walk for 2 hours in an 8-hour workday; occasionally climb and stoop; and that he had a limited ability to push and pull with his upper extremities.  (Tr. 644-47).[3]

---

has not challenged these conclusions; thus, records pertaining to these conditions will not be discussed in detail herein.

[2] An April 9, 2004 MRI of Moraniec's lumbar spine showed minimal degenerative disc disease at L3-L4 and L5-S1, with no herniation or spinal stenosis.  (Tr. 566).

[3] When asked whether Moraniec would have difficulty maintaining attention and concentration

The record also contains evidence that Moraniec has a history of tachyrhythmia.  In August of 2002, Moraniec was twice taken to the Garden City Hospital Emergency Department, both times complaining of chest pressure.  (Tr. 281, 283).  During these visits, he was given a full cardiac workup, including a stress test, which was negative for any evidence of myocardial ischemia.  (Tr. 283).  On September 4, 2002, Moraniec presented to the emergency department at Oakwood Annapolis Hospital, again complaining of chest pain, difficulty breathing, and a rapid heart rate.  (Tr. 293).  An echocardiogram and Moraniec's cardiac enzymes were normal.  (Tr. 294).  Ultimately, he was discharged with a diagnosis of tachyrhythmia, possibly related to a panic attack, and prescribed Toprol.  (*Id.*).  The record reflects that Moraniec complained to Dr. Terrio of similar symptoms on and off over the years.  (Tr. 543, 589, 591, 599).  However, an echocardiogram taken in August of 2005 was also normal.  (Tr. 551).

Moraniec also suffers from gout in his right big toe.  An x-ray taken in 2005 showed only minor osteoarthritis in his right foot.  (Tr. 550).  Although his right big toe was swollen, tender, red, and warm at his July 2010 consultative examination, he was able to walk with a stable gait, tandem walk, and heel walk, even with the gout inflammation.  (Tr. 651).  As the ALJ noted, Dr. Terrio's records indicate only one other gout flare (Tr. 352), which suggests that the flares are not severe enough to warrant treatment or that they are controlled with medication.

*(b)   Mental Impairments*

*(1)   Dr. Friedman*

The ALJ also concluded that Moraniec suffers from the severe mental impairments of major depressive disorder and panic disorder with agoraphobia.  (Tr. 27).  Moraniec had his first

---

for an 8-hour workday, Dr. Terrio said:  "[Moraniec] suffers from anxiety disorder."  (Tr. 646). In addition, the record contains another letter from Dr. Terrio, dated February 16, 2012, in which he stated:  "[Moraniec] suffers from disabling anxiety disorder and panic disorder.  He is presently totally disabled from any work."  (Tr. 674).

psychiatric evaluation on January 14, 2003, with Dr. Howard Friedman, at which time he had been off work for approximately four months. (Tr. 475-77). On his last day of work, September 4, 2002, Moraniec had been sitting at his desk doing routine paperwork when he experienced "an acute panic anxiety attack," manifested by shortness of breath, tingling of his fingers, and a feeling that he was going to pass out. (Tr. 475). He called 9-1-1 and was taken to the emergency room at Oakwood Annapolis Hospital, where he was told that he "most probably was experiencing a panic episode and that all of his tests were negative." (*Id.*). Since that time, Moraniec has continued to experience periodic anxiety episodes.[4] (*Id.*).

According to Dr. Friedman, Moraniec was continuing "to pursue medical evaluations for what several physicians, including two prior psychiatric evaluations, have assured him [sic] were very typical panic anxiety episodes." (*Id.*). On examination, Dr. Friedman noted that Moraniec had a high level of anxiety but was pleasant and cooperative; showed no signs of any thought disorder, hallucinations, or delusions; and was fully oriented with memory intact. (Tr. 476). Dr. Friedman diagnosed Moraniec with acute panic anxiety disorder and assigned a Global Assessment of Functioning (GAF)[5] score of 50. He opined that, at the time, Moraniec was totally disabled from employment, based on the frequency and severity of his anxiety attacks. (*Id.*). However, Dr. Friedman also indicated that, with continued medication and therapy, "it is very probable that he can return to full employment within the next 30 days." (*Id.*).

(2)    *Dr. Ajluni*

Moraniec did eventually return to work and continued working until July 8, 2006. In

---

[4] Moraniec informed Dr. Friedman that he was seeing Dr. Restrem, a psychotherapist, during this period of time. (Tr. 476). However, there are no documents in the record reflecting such treatment.

[5] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Commissioner of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

8

September of 2006, Moraniec began treating with Dr. Ajluni at University Psychiatric Centers. At his intake assessment, on September 18, 2006, Moraniec indicated that he had been referred by Dr. Terrio because he was suffering from panic attacks and depression.[6] (Tr. 317). Moraniec reported that, after the events of September 11, 2001, he began experiencing depressed mood with crying spells, increased anxiety with panic attacks, feelings of hopelessness, lack of concentration, and problems with short-term memory. (*Id.*). Dr. Ajluni diagnosed Moraniec with panic disorder with agoraphobia and assigned him a GAF score of 65. (Tr. 323).

At a follow-up visit on October 10, 2006, Moraniec reported that he had experienced no "full blown" panic attacks since starting Lexapro the week before. (Tr. 326). He had been able to go to the store and pick up his daughter from school, and he reported sleeping better. (*Id.*). His GAF score remained 65. (*Id.*). At his next visit, on February 5, 2007, Moraniec indicated that his anxiety could still be overwhelming at times, but he believed the Lexapro was helping "to a great degree" with his panic attacks. (Tr. 328). He was particularly anxious about returning to work, indicating that "just the thought of putting on his uniform brings on severe anxiety." (*Id.*). He was diagnosed with post-traumatic stress disorder (in addition to panic disorder with agoraphobia), but his GAF was again assessed as 65. (*Id.*). The next week, Moraniec reported that although he rarely leaves the house, he had been able to attend his daughter's basketball game. (Tr. 329). His GAF score remained 65. (*Id.*).

Moraniec did not return to see Dr. Ajluni until August 27, 2007. At that visit, Dr. Ajluni noted that Moraniec looked "very well" compared to prior appointments, and Moraniec reported that Lexapro was helping him much more than Paxil had. (Tr. 331). His GAF score was again assessed at 65, and his condition was described as "stable." (*Id.*). At his next visit, on April 7,

---

[6] Indeed, Dr. Terrio had been prescribing Paxil for Moraniec's mental impairments. (Tr. 318, 543).

2008, Dr. Ajluni noted that Moraniec had been non-compliant with therapy; despite this fact, his condition was still characterized as "stable," and his GAF score was still 65. (Tr. 333). In May of 2008, Moraniec's GAF score dipped to 60 because of anxiety stemming from his pending worker's compensation case (and accompanying financial worries), but his condition was described as stable at this and subsequent visits through June of 2008. (Tr. 334, 337, 339). Since that time, Moraniec has received no other consistent mental health treatment; however, he submitted to several psychiatric examinations for his worker's compensation and disability claims.

### (3)    Dr. Raymond Mercier

In October of 2006, Moraniec underwent an independent psychiatric evaluation with Dr. Raymond Mercier regarding his ability to return to work. (Tr. 534-42). Dr. Mercier noted that Moraniec "seemed to have anxiety throughout the entire exam about virtually every topic." (Tr. 540). Dr. Mercier characterized the visit as "an abnormal mental status examination," and diagnosed Moraniec with panic disorder and major depression, noting that Moraniec demonstrated significant obsessive-compulsive features and a high level of anxiety. (Tr. 541-42). Dr. Mercier opined that psychiatric treatment and counseling might be beneficial, and he also suggested that taking a new antidepressant might help alleviate some of Moraniec's symptoms. (Tr. 542). In conclusion, Dr. Mercier opined that Moraniec would likely be off work for "a couple of months." (*Id.*).

### (4)    Dr. Michael Freedman

Moraniec next submitted to an independent psychiatric evaluation with Dr. Michael Freedman on January 10, 2007, as part of his then-pending worker's compensation case. (Tr. 609-18). Dr. Freedman noted that Moraniec displayed a constricted affect (consistent with

10

depression), but was cooperative with no evidence of an overt thought disorder. (Tr. 610). Moraniec indicated that he had a history of panic attacks, but they had not been as bad since he began taking Lexapro. (Tr. 614). Based on his examination, Dr. Freedman diagnosed Moraniec with dysthymia (chronic depression) and generalized anxiety disorder. (Tr. 617). He opined that Moraniec was unable to return to work as a police officer, but said that he might be able to "function in some type of restricted office setting." (Tr. 617-18). Dr. Freedman further questioned whether Moraniec was motivated to return to work. (Tr. 617).

### (5) Dr. Robert Ancell

On August 6, 2008, Robert Ancell, Ph.D., completed a vocational rehabilitation assessment of Moraniec. (Tr. 625-27). In that assessment, Dr. Ancell noted that he had reviewed Moraniec's records, and that Moraniec was suffering from anxiety, panic attacks, and agorabphobia. (Tr. 625-26). Dr. Ancell indicated that Moraniec was experiencing "significant anxiety," was feeling "overwhelmed," and was totally unable to perform work that would meet his previous earnings capacity. (Tr. 623-27). Dr. Ancell concluded by saying, "Depending on his ability to interact with individuals, he may be able to monitor television sets in a rather quiet area. However, based on the current difficulties, I would even question that ability." (Tr. 627).

### (6) Dr. Judith Kovach

Moraniec also underwent a consultative mental status examination with Judith Kovach, Ph.D., on August 8, 2008. (Tr. 373-75). He showed poor self-esteem, exhibited a flat affect and depressed mood, and his motor activity was slow. (Tr. 374). He was able to repeat six numbers forward and four numbers backward, but his answers were "much slower than normal." (Tr. 375). He was able to recall 0/3 objects after a delay of three minutes. (Id.). However, he was oriented to time, person and place, identified the past three Presidents, and gave appropriate

11

answers to questions reflecting on his judgment and his ability to engage in abstract thinking. (Tr. 374-75). Dr. Kovach also found that Moraniec was capable of handling his own funds. (Tr. 275). Dr. Kovach diagnosed major depressive disorder, moderate, and panic disorder, assigned a GAF score of 35-40, and described Moraniec's prognosis as "guarded." (*Id.*).

### (7)     *Dr. Daniel Blake*

On August 26, 2008, state agency psychological consultant Daniel Blake examined Moraniec's records and opined that he was moderately limited in maintaining social functioning and concentration, persistence or pace, and mildly limited in activities of daily living, but that he retained mental functions "sufficient for sustained work activity." (Tr. 381, 393).

### (8)     *Dr. Richard Rizzo*

On May 11, 2010, Moraniec underwent another independent psychological examination, this time with Richard Rizzo, Ph.D. (Tr. 263-64). Moraniec detailed the panic attacks he had been suffering, saying that, when he was still working, they caused him to become very confused and fearful and he frequently would hide in closets and cry. (Tr. 628). He also expressed feeling depressed, helpless, hopeless, worthless, and useless, and Dr. Rizzo noted that he ruminates over emotional problems. (Tr. 629). Moraniec said that he communicates with some friends online, but avoids any get-togethers. (Tr. 630). In terms of hobbies, he spends time with his dogs, watches television, and "mess[es] around in his garage." (*Id.*). He has trouble going to restaurants or grocery stores (he goes grocery shopping after midnight), and he frequently has trouble driving due to his panic attacks.[7] (*Id.*). Dr. Rizzo noted that Moraniec has extremely low self-esteem and very little insight into his current problems. (Tr. 631).

During the mental status examination, Moraniec was fully oriented, was able to repeat

---

[7] Moraniec reported, however, that he drives his sixteen-year-old daughter to school in the mornings and, on certain days, picks her up from school. (*Id.*).

seven numbers forward and four numbers backward, and could recall 2/3 objects after a three minute delay, but he had difficulty performing simple mathematical calculations.  (Tr. 631-32).  Dr. Rizzo diagnosed Moraniec with panic disorder with agoraphobia, generalized anxiety disorder, and dysthymia, assigned him a GAF score of 38, and said that he "is unable to work in any type of vocational setting on a sustained basis."  (Tr. 633).  Dr. Rizzo also completed a medical source statement, in which he indicated that Moraniec has extreme limitations in all areas of function and that he is "unable to understand and remember any types of instructions," "unable to make any decisions," and "unable to interact with others."  (Tr. 637-38).

On August 18, 2010, Dr. Rizzo issued a "Psychological Summary," in which he reiterated his diagnoses and summarized Moraniec's condition as follows:

> His panic is so severe that he fears dying, passing out or losing control. He has become so afraid of panic that he tries to avoid others by staying in his house all day.  He tends to fear being around people so much that he goes grocery shopping at midnight and tries to avoid even going out to dinner with his daughter.
>
> *       *       *
>
> Due to his [conditions], Mr. Moraniec is unable to perform the most elementary of functions.  He avoids others and fears driving.  He does not interact with others except for his daughter but even with her, avoids social contact outside of the house.
>
> *       *       *
>
> Due to his severe physical, emotional and social limitations, Mr. Moraniec is unable to perform any type of vocational activity on a sustained basis.

(Tr. 263).  Dr. Rizzo further opined that Moraniec's impairments meet the criteria of Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders).  (Tr. 263-64).

*(9)     Dr. Nick Boneff*

Moraniec underwent another mental consultative examination on July 26, 2010 with Dr. Nick Boneff, Ph.D.  (Tr. 664-70).  He drove himself alone to the appointment.  (Tr. 664).  Dr.

Boneff administered several intelligence tests to Moraniec and performed a mental status examination. (Tr. 665-66). As a result, Dr. Boneff diagnosed Moraniec with panic disorder and depression, as well as borderline intellectual functioning, assigned a GAF score of 50, and described his prognosis as "fair." (Tr. 667). He indicated that Moraniec has no limitations in his ability to understand, remember, and carry out simple or complex instructions; make judgments on simple or complex work-related decisions; interact appropriately with the public, supervisors, or co-workers; and respond appropriately to usual work situations and changes in a routine work setting. (Tr. 668-69). Dr. Boneff further indicated that Moraniec cannot manage his benefits independently, however, because of "difficulties with calculations." (Tr. 670).

### 4.    *Vocational Expert's Testimony*

Diane Regan testified as an independent vocational expert ("VE"). (Tr. 70-74). The VE characterized Moraniec's past relevant work as a police officer as skilled in nature and medium in exertion. (Tr. 70). The ALJ asked the VE to imagine a claimant of Moraniec's age, education, and work experience, who was limited to light work, with only occasional climbing, balancing, stooping, kneeling, crouching, or crawling; simple, routine, repetitive tasks; no interaction with the public; and only occasional interaction with coworkers. (Tr. 70-71). The VE testified that the hypothetical individual would not be capable of performing Moraniec's past relevant work. (Tr. 70-71). However, the VE testified that the hypothetical individual would be capable of working in the positions of machine tender (12,000 jobs), small products assembler (8,000 jobs), and inspector checker (18,000 jobs). (*Id.*). Upon further questioning, the VE testified that if the hypothetical individual needed a sit/stand option after 20-30 minutes, the Dictionary of Occupational Titles would not define the number of available jobs. (Tr. 71-72). The VE further testified, however, that based on her own experience, the hypothetical individual

14

still would be able to perform all 12,000 machine tender positions, as well as half of the small

products assembler and inspector checker positions (4,000 and 9,000 jobs, respectively).  (*Id.*).

### C.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity,
> has a severe impairment that is expected to last for at least twelve months,
> and the severe impairment meets or equals one of the impairments listed in
> the regulations, the claimant is conclusively presumed to be disabled
> regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the
> claimant can perform, in view of his or her age, education, and work
> experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Moraniec is not disabled under the Act.  At Step One, the ALJ found that Moraniec has not engaged in substantial gainful activity since July 8, 2006, his alleged onset date.  (Tr. 27).  At Step Two, the ALJ found that Moraniec has the severe impairments of history of tachyrhythmia, degenerative disc disease, gout, major depressive disorder, and panic disorder with agoraphobia.  (Tr. 27-28).  At Step Three, the ALJ found that Moraniec's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 28).

The ALJ then assessed Moraniec's residual functional capacity ("RFC"), concluding that he is capable of performing light work, with the following additional limitations:  sit/stand option after 20-30 minutes; only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling; simple, routine, repetitive tasks; no interaction with the public; and only occasional interaction with coworkers (but not as a team member).  (Tr. 29-38).

At Step Four, the ALJ determined that Moraniec is unable to perform his past relevant work as a police officer, which was skilled in nature and medium exertion.  (Tr. 38).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Moraniec is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 38-39).  As a result, the ALJ concluded that Moraniec is not disabled under the Act.  (Tr. 39).

E.        **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human*

17

*Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

In his motion for summary judgment, Moraniec argues that the ALJ erred in failing to properly weigh the medical evidence and in relying upon flawed VE testimony. In addition, in his reply brief, Moraniec argues for the first time that his case should be remanded to the ALJ for consideration of new evidence. Each of these arguments will be addressed in turn.

> *1.     The ALJ's Consideration of the Medical
> Opinions is Supported by Substantial Evidence*

Moraniec first argues that the ALJ gave too little weight to the opinions of Dr. Terrio, Dr. Samuel, and Dr. Rizzo. (Doc. #14 at 13-22). A review of the record, however, indicates that the ALJ's conclusions are supported by substantial evidence.

> *a.     Dr. Terrio*

Moraniec's primary care physician, Dr. Terrio, submitted a letter, dated July 2, 2010, indicating that he had been treating Moraniec for moderate to severe C6 radiculopathy and a disc protraction at C5-C6 and C6-C7 with effacement of the subarachnoid. (Tr. 641). He also provided a medical source statement, dated June 29, 2010, in which he opined that Moraniec could frequently lift 10 pounds and occasionally lift 20 pounds; stand and/or walk for 2 hours in

an 8-hour workday; occasionally climb and stoop; and that he had a limited ability to push and pull with his upper extremities. (Tr. 644-47). Moraniec asserts that "the ALJ did not give any weight to Dr. Terrio's letter dated July 2, 2010, which was submitted to both the ALJ and the Appeals Council."[8] (Doc. #14 at 14).

An ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence."). If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. § 404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion).

---

[8] Moraniec also alleges that, "The Appeals Council did not even make reference to the additional medical evidence to the Appeals Council which was additional to the evidence presented at trial." (Doc. #14 at 14). Although somewhat unclear, it appears Moraniec is asserting that the Appeals Council failed to consider Dr. Terrio's February 16, 2012 letter, which was made part of the record as Exhibit 38F. (*Id.*, citing Tr. 674). In reality, however, the Appeals Council received and considered this document. (Tr. 4). Thus, this argument fails.

As an initial matter, Moraniec is simply incorrect in asserting that "the ALJ did not give any weight" to Dr. Terrio's opinion.  (Doc. #14 at 14).  To the contrary, the ALJ explicitly gave Dr. Terrio's opinion "some weight" and credited a large portion of his opinion in finding that Moraniec can perform a restricted range of light work with certain postural restrictions.  (Tr. 37). Indeed, in some respects, the ALJ found that Moraniec is even more limited than Dr. Terrio opined, concluding that he requires a sit/stand option after 20-30 minutes and that he can only occasionally balance, stoop, kneel, crouch, and crawl (in addition to climb).  (*Id.*).

The ALJ did discount Dr. Terrio's opinion that Moraniec's ability to push and pull would be limited due to numbness and tingling in his upper extremities (Tr. 645), finding that there was "no objective evidence in the record to suggest [his] neck impairment causes significant numbness/tingling to impose limitations on his ability to push or pull."  (Tr. 37).  The ALJ's reliance on the lack of objective medical evidence was reasonable.  *See* 20 C.F.R. §404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). In his motion for summary judgment, Moraniec points to x-rays and an MRI of his cervical spine, taken in January and February of 2005, respectively, as evidence supporting Dr. Terrio's opinion in this regard.  (Doc. #14 at 17).  But, while these test results show that Moraniec has a cervical spine impairment, they do not demonstrate that this impairment consistently produced numbness or tingling in his upper extremities.   Dr. Terrio's treatment notes indicate that Moraniec complained of these symptoms only once – in January of 2005 – and that he made no mention of alleged numbness or tingling at subsequent visits.  (Tr. 589-97).  Therefore, Moraniec has not shown that the ALJ erred in refusing to credit this portion of Dr. Terrio's opinion.

Moraniec also appears to argue that the ALJ erred in discounting Dr. Terrio's opinion

that his anxiety disorder would affect his ability to maintain concentration and attention for an 8-hour day.  (Doc. #14 at 19, citing Tr. 646).  In giving only "some weight" to this portion of Dr. Terrio's opinion, the ALJ correctly noted that Dr. Terrio does not specialize in psychiatric conditions and, thus, had a limited ability to provide an accurate opinion of Moraniec's mental abilities.  (Tr. 37).  Dr. Terrio's treatment notes indicate that, aside from renewing Moraniec's Paxil/Lexapro prescriptions, he did not treat Moraniec's psychiatric problems.  (Tr. 543-90). The regulations permit an ALJ to consider a medical source's specialization in determining how much weight to afford an opinion.  *See* 20 C.F.R. §404.1527(d)(5) ("Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  Thus, the ALJ's decision to discount Dr. Terrio's opinion regarding the effect of Moraniec's anxiety disorder is supported by substantial evidence and is consistent with the applicable regulations.

Moreover, even if the ALJ were to determine that this portion of Dr. Terrio's opinion is entitled to greater weight, the fact remains that Dr. Terrio did not explain *how* Moraniec's concentration would be affected by his anxiety disorder.  In formulating Moraniec's RFC, the ALJ accounted for his mental limitations, including his difficulty maintaining concentration, by limiting him to simple, routine, repetitive tasks; no interaction with the public; and only occasional interaction with coworkers (but not as a team member).  (Tr. 29).  In other words, Dr. Terrio's vague and generalized statement that Moraniec's anxiety disorder would affect his ability to maintain concentration and attention for an 8-hour day does not necessarily conflict with or undermine the ALJ's RFC finding.  For all of these reasons, the ALJ's decision to give Dr. Terrio's opinion "some weight" is supported by substantial evidence.

b.      Dr. Samuel

Moraniec also argues that the ALJ should have given controlling weight to some unspecified "opinion" of Dr. Samuel, a neurologist who examined him in January of 2005. (Doc. #14 at 16).  Specifically, in his reply brief, Moraniec cites *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013), for the proposition that because Dr. Samuel was a consulting physician who physically examined him, his opinion should be given greater weight than that of a non-examining physician.  (Doc. #19 at 10).

Moraniec is correct that, as a general rule, "an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination …." *Gayheart*, 710 F.3d at 375.  In this case, however, it is not clear exactly what "opinion" Moraniec is referring to, as Dr. Samuel did not issue any medical opinion concerning Moraniec's functional limitations.  Rather, after examining Moraniec on January 25, 2005, Dr. Samuel indicated only that he suspected "cervical spine degenerative disk problems" and advised Moraniec to "start some kind of regular aerobic exercise program and back and neck strengthening as well."  (Tr. 532).  Such conservative proposed treatment is consistent with the ALJ's findings.  *Seay v. Comm'r of Soc. Sec.*, 2012 WL 3759027, at *6 (E.D. Mich. Aug. 6, 2012) (ALJ properly considered claimant's conservative courses of treatment in evaluating weight to afford treating source's opinions).  Thus, even if the ALJ had afforded Dr. Samuel's "opinion" controlling weight, as Moraniec suggests, nothing in Dr. Samuel's "opinion" (or his treatment notes, for that matter) undermines the ALJ's RFC finding.  Moreover, Moraniec does not identify any non-examining physician's opinion that purportedly conflicts in some way with Dr. Samuel's "opinion" and that was erroneously given too much weight.  As such, *Gayheart* is inapposite and does not require remand.

c.    *Dr. Rizzo*

On May 11, 2010, after conducting an independent psychological examination, Dr. Rizzo diagnosed Moraniec with panic disorder with agoraphobia, generalized anxiety disorder, and dysthymia; assigned him a GAF score of 38; and said that he "is unable to work in any type of vocational setting on a sustained basis." (Tr. 633). Dr. Rizzo also completed a medical source statement, in which he indicated that Moraniec has extreme limitations in all areas of function and that he is "unable to understand and remember any types of instructions," "unable to make any decisions," and "unable to interact with others." (Tr. 637-38). Moraniec asserts – albeit quite vaguely – that the ALJ erred in giving "little weight" to this opinion. (Doc. #14 at 21).

In reviewing the ALJ's decision, it is clear that he provided several valid reasons for assigning little weight to Dr. Rizzo's opinion. (Tr. 34-35). First, the ALJ noted that Dr. Rizzo's own findings fail to support the severe limitations he placed on Moraniec. (Tr. 35). For example, Dr. Rizzo stated that Moraniec is "unable to understand or remember any type of instructions" (Tr. 637), yet found that he had intact memory and could exercise judgment and perform abstract thinking (Tr. 631-32). (Tr. 35). Likewise, Dr. Rizzo's finding that Moraniec is "unable to make any decisions" (Tr. 637) contradicts his finding that he could manage his own benefit funds, if approved, and exercise judgment (Tr. 632-33). (Tr. 35). The ALJ also noted that Dr. Rizzo's opinion was inconsistent with Moraniec's limited mental health treatment, explaining that a claimant with "extreme limitations in all areas of function [as Rizzo found with respect to Moraniec] would likely require inpatient psychiatric treatment or at least regular outpatient mental health treatment." (*Id.*). Thus, the ALJ reasonably concluded that Dr. Rizzo's opinion did not appear to be based on his objective findings, or any other findings of record, and his decision to give this opinion "little weight" is supported by substantial evidence. *See* 20

23

C.F.R. §404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

2.    <em>The ALJ Reasonably Relied on the Vocational Expert's Testimony</em>

Moraniec appears to challenge the VE's testimony on two bases.  First, he argues that the VE's testimony "was rejected by the ALJ as being inconsistent with information contained in the dictionary of occupational titles."   (Doc. #14 at 22).   Second, he broadly argues that the hypothetical questions posed to the VE did not include all of his alleged limitations and impairments.  (<em>Id.</em> at 21).  Both of these arguments lack merit.

As an initial matter, Moraniec is simply incorrect in asserting that the ALJ "rejected" the VE's testimony as inconsistent with the Dictionary of Occupational Titles ("DOT").  It is true that the ALJ noted that a discrepancy existed between the VE's testimony and the DOT with respect to the effect of a sit/stand option on the number of positions available for an individual with Moraniec's age, education, work experience, and RFC.  (Tr. 39).  However, the ALJ provided a reasonable basis for relying on the VE's testimony (as opposed to the DOT) on this issue.  Specifically, the ALJ explained that he was relying on the VE's testimony because, "The DOT is silent in regards to [the sit/stand option] and the information the vocational expert provided is based on her own professional experience."  (<em>Id.</em>).  This is exactly what the applicable regulations require of an ALJ.  <em>See Soc. Sec. Rul.</em> 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) ("Neither the DOT nor the [VE] evidence automatically 'trumps' when there is a conflict.  The adjudicator must resolve the conflict by determining if the explanation given by the [VE] is reasonable and provide a basis for relying on the [VE] testimony rather than on the DOT information.").  Accordingly, the ALJ did not err in crediting the VE's testimony on this issue.

Moraniec also appears to argue that the ALJ's hypothetical questions were insufficient because they failed to account for all of his credible limitations.  (Doc. #14 at 21).  An ALJ may

24

rely on the testimony of a vocational expert to determine whether jobs would be available for an individual who has particular workplace restrictions.  *See Wilson*, 378 F.3d at 548.  Thus, in order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of a conclusion that the claimant can perform other work, the question must accurately portray the claimant's physical and mental impairments.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).

To the extent that Moraniec argues that his functional limitations were greater than those found by the ALJ, the court has already rejected his challenges to the ALJ's weighing of the opinions of Drs. Terrio, Samuel, and Rizzo.  Moreover, although Moraniec does not specifically challenge the weight assigned to various other medical opinions, the court finds that the ALJ properly evaluated the relative merit of these opinions[9] and that, as a result, the ALJ's determination of Moraniec's RFC was appropriate and supported by substantial evidence.

The ALJ posed a complete hypothetical question to the VE – asking her to consider an individual with Moraniec's age, education, work experience, and RFC – and reasonably accepted the VE's testimony that the hypothetical individual described could perform work that exists in

---

[9] For example, the ALJ gave "some weight" to the opinion of Dr. Mercier, who examined Moraniec in October of 2006 and opined that he would need to be off work for only "a couple months."  (Tr. 34, citing Tr. 542).  Similarly, the ALJ gave "some weight" to Dr. Freedman's opinion, reached in January of 2007, that Moraniec could possibly "function in some type of restricted office setting."  (Tr. 34, citing Tr. 618).  He also gave "some weight" to Dr. Friedman's opinion that it "was very probable [Moraniec] can return to full time employment in the next 30 days."  (Tr. 33) (quoting Tr. 476).  Those opinions are consistent with the ALJ's RFC determination (*i.e.*, that Moraniec have "no interaction with the public" and only "occasional interaction with coworkers, but not as a team member" (Tr. 29), and his finding that Moraniec is not disabled under the Act.  The ALJ also considered the opinion of Dr. Kovach, appropriately giving it "little weight" because the GAF score she assigned (35-40) was "internally inconsistent with Dr. Kovach's own findings" which showed Moraniec was "in contact with reality and had spontaneous, logical and organized speech…demonstrated intact judgment and intact abstract judgment…[and that] [Moraniec] could manage his own funds…" (Tr. 35, citing Tr. 372-75).  *See also supra* at 11-12.  Thus, the ALJ properly evaluated the merits of the various "other" opinions referenced by Moraniec, and his decision is supported by substantial evidence.

significant numbers in the national economy.  This testimony provides substantial evidence to support the ALJ's finding that Moraniec was not disabled during the period in question.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (where hypothetical accurately described the plaintiff in all relevant respects, the VE's response to the hypothetical question constitutes substantial evidence).

<em>3. Moraniec is Not Entitled to a Sentence Six Remand</em>

Attached to Moraniec's reply brief is a second report from Dr. Rizzo, this one dated January 12, 2013, in which Dr. Rizzo again opines – as he did in his May 2010 report – that Moraniec suffers from panic disorder with agoraphobia, generalized anxiety disorder, dysthymia, and posttraumatic stress disorder; has a GAF score of 38; and is "unable to work in any type of vocational setting on a sustained basis."  (Doc. #19-1 at 7).  In his reply brief, Moraniec argues – apparently pursuant to sentence six of 42 U.S.C. §405(g) – that the court should remand the case to the ALJ for consideration of this report.  (Doc. #19 at 7-8).

Remand to consider additional evidence is appropriate only when the evidence is new and material, and good cause is shown as to why it was not presented at the prior proceeding.  *See* 42 U.S.C. §405(g); *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding."  *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).  Here, the medical records at issue reflect an independent psychological examination conducted by Dr. Rizzo in January of 2013.  Thus, the records can be considered "new" evidence, as they did not exist at the time of the July 8, 2010 hearing.  (Doc. #19-1).  However, even if Moraniec could establish "good cause" for his failure to submit these records sooner, he has failed to demonstrate

26

that these records are "material."[10]

Courts have held that additional evidence is material only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988). In this case, Moraniec has failed to establish that Dr. Rizzo's January 13, 2013 report is "material" under these standards.

Dr. Rizzo assessed Moraniec's mental state as of January 2013, more than two full years after the ALJ issued his decision. On its face, then, Dr. Rizzo's report does not purport to relate to the time period relevant to this case, *i.e.*, the alleged onset date through the date of the ALJ's decision. *See Thompson v. Comm'r of Soc. Sec.*, 2012 WL 910048, at *8 (W.D. Mich. Mar. 15, 2012) (claimant's additional evidence was not material because it did not reflect claimant's condition during this relevant time period). More importantly, however, Dr. Rizzo's January 2013 report is not material because it is virtually identical to the May 2010 report that the ALJ thoroughly considered, discussed, and gave "little weight." (Tr. 34-35 (citing Tr. 628-39); Doc. #19-1). *See supra* at 23. In both reports, Dr. Rizzo listed Moraniec's diagnoses as panic

---

[10] "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. As this court recently recognized, "'Good cause' is *not* established solely because the new evidence was not generated until after the ALJ's decision; the Sixth Circuit has taken a 'harder line' on the good cause test." *Richardson v. Comm'r of Soc. Sec.*, 2012 WL 4210619, at *4 (E.D. Mich. Aug. 27, 2012) (citing *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)) (emphasis in original). A plaintiff attempting to introduce new evidence "must explain why the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision." *Richardson*, 2012 WL 4210619, at *4.

Here, where Moraniec seeks to supplement the record with an updated report from Dr. Rizzo, who is not a treating physician, the court has doubts as to whether Moraniec can satisfy the "good cause" standard. *See Koulizos v. Sec'y of Health & Human Servs.*, 1986 WL 17488, at *2 (6th Cir. Aug. 19, 1986) (good cause is shown for sentence six remand only "if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability"). Regardless, however, this point is moot in light of the court's findings as to the evidence's lack of materiality.

disorder with agoraphobia, generalized anxiety disorder, and dysthymia; assigned him a GAF score of 38; and said that he "is unable to work in any type of vocational setting on a sustained basis." (Doc. #19-1 at 7; Tr. 633). And, in both 2010 and 2013, Dr. Rizzo completed medical source statements, in which he indicated that Moraniec has extreme limitations in all areas of function. (Doc. #19-1 at 11-13; Tr. 637-38). As discussed more fully above, *supra* at 23, the ALJ articulated several reasons for giving little weight to Dr. Rizzo's 2010 opinion, all of which are supported by substantial evidence. It stands to reason, then, that the ALJ would similarly discount Dr. Rizzo's January 2013 report – which reached the same conclusions and suffered from the same deficiencies – if he was presented with that evidence. *See Longworth*, 420 F.3d at 598 (evidence is not material where it is "largely cumulative of evidence and opinions already present in the record").

For all of these reasons, Moraniec has not established a reasonable probability that the Commissioner would have reached a different conclusion on the issue of disability if he was presented with the new evidence prior to issuing his decision. As such, Moraniec is not entitled to a sentence six remand.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Moraniec's Motion for Summary Judgment [14] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: May 29, 2013                                    s/David R. Grand
Ann Arbor, Michigan                                    DAVID R. GRAND
                                                       United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 29, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

29